OCEANIC S. S. CO. v. SIMPSON LUMBER CO.

(Circuit Court of Appeals, Ninth Circuit. March 6, 1911.)

No. 1,820.

1. COLLISION (§ 43*)—STEAM AND SAILING VESSELS—DUTY OF CARE ON THE PART OF STEAMER.

It is the duty of a steamer sighting a sailing vessel ahead at sea to watch with the highest diligence her course and movements so as to be able to adopt such timely measures of precaution as may be necessary to prevent a collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 43–47; Dec. Dig. § 43.*]

2. COLLISION (§ 45*)—STEAM AND SAILING VESSELS—NEGLIGENT NAVIGATION OF STEAMER.

A steamer *held* solely in fault for a collision at sea with a schooner at night for not paying proper attention and taking proper precautions to avoid collision after the schooner was sighted; it appearing from the testimony of her own witnesses that although the lights of the schooner were seen about twelve minutes before collision, when the vessels were four miles apart in such position as to involve danger of meeting, no order was given looking to keeping the steamer out of the way until the collision was imminent, and when it was too late to avoid it.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 51; Dec. Dig. § 45.*]

Appeal from the District Court of the United States for the Northern District of California.

Suit in admiralty by the Simpson Lumber Company as owner of the schooner Advent against the steamer Sonoma, the Oceanic Steamship Company, claimant. Decree for libelant, and claimant appeals. Affirmed.

Nathan H. Frank, for appellant.
George H. Whipple, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The schooner Advent, while making a voyage from Coos Bay, Or., to San Francisco, with a cargo of lumber, was struck on her port bow just forward of the port cathead by the steamer Sonoma on one of her voyages from San Francisco to Seattle, inflicting damage for which the libelant was given judgment by the court below. At the time of the collision, which occurred about 2 o'clock in the morning, the weather was good and the sea smooth. The schooner, which was of 399 registered tonnage, was making from 5 to 7 knots an hour, and the steamer about 13½ knots. The record shows that the steamer discovered the green light of the schooner about 12 minutes before the collision, when the two were about four miles apart. In such circumstances the established rule is:

"That the steamship, from the moment the sailing vessel is seen, shall watch with the highest diligence her course and movements, so as to be able to adopt such timely measures of precaution as will necessarily prevent the two boats coming in contact." The Carroll, 8 Wall. 302–306, 19 L. Ed. 392.

A careful examination of the record satisfies us that the court below was right in its conclusion that the collision in question was brought about by the failure of the steamer to perform its duty in that regard. There is much conflicting evidence in the cause, a detailed review of which is not necessary, since it would serve no useful purpose. It will be enough to refer briefly to some of the testimony of the appellant's chief witnesses and to the steamer's log containing entries in respect to the collision, made immediately thereafter.

In the pilot house logbook the entry is:

"2:06 (of the morning of the collision) sighted vessel on port bow showing green light.

"2:16 Vessel showed a red light close aboard stopped port engine and reversed it but could not clear vessel striking her forward bringing all her top hamper down on Sonoma deck."

The entry in the mate's log of the same date is as follows:

"2:06 Sighted vessel port bow showing green lt.

"2:16 Vessel tacked showing redlight; stopped port engine and reversed full speed; 2:18 struck vessel forw'd taking jib boom & top hamper in our stb'd fw'd rigging."

The log of the steamer, therefore, shows that from the time the green light of the schooner was sighted until she was struck by the ship 12 minutes elapsed. Now during that time what, according to the testimony of those in charge of the steamer's movements, did the steamer do to keep out of the way of the approaching schooner? Take the man at the wheel at the time in question—Henry Casson We extract from his testimony as follows:

"Q. Were you on board the Sonoma at the time of the collision with the schooner Advent? A. Yes.

"Q. In what capacity were you on board? A. Quartermaster.

"Q. Where were you at the time of the collision? A. At the wheel, sir.

"Q. You were at the wheel? A. Yes.

"Q. How long had you been at the wheel? A. I was at the wheel. I relieved the man at the wheel at 2 o'clock, a little after 2, sir. The collision occurred about 2:20. * * *

"Q. Do you remember the course you were steering this night before the collision? A. Yes, sir.

"Q. What was it? A. North 45 degrees west.

"Q. Did you get any orders before the collision to change that? A. Yes, sir.

"Q. What orders did you get? A. Hard-a-starboard.

"Q. Did you execute that order? A. Yes, sir.

"Q. How long after you executed it was it before you got another order? A. Well, that is one thing I can't swear to. I won't testify to anything except what I can swear to.

"Q. Did you get another order? A. Yes, sir.

"Q. What was the other order? A. Hard-a-port.

"Q. Now, before you got this order of hard-a-port had the vessel begun to swing at all on her hard-a-starboard course? A. No, sir.

"Q. She had not? A. No, sir.

"Q. Did you execute the hard-a-port order? A. Yes, sir.

"Q. Did you complete that before you got another order? A. Hard-a-starboard; yes.

"Q. Had you completed a hard-a-port order? A. Yes, sir.

"Q. You got a hard-a-starboard again? A. Yes, sir.

"Q. Had she begun to swing on her hard-a-port course? A. No, sir; I think the ship steadied up.

"Q. Steadied up? A. Yes, sir.

"Q. Now, after this second hard-a-starboard order, what happened? A. After the second time?

"Q. Yes. A. After the second, as far as I can remember, it is quite a while ago, I think the captain told me to steady her up.

"Q. I mean with reference to the collision, how far did you get over on hard-a-starboard? A. About half way.

"Q. Then what happened? A. Then the crash came.

"Q. The crash came then? A. Yes, sir.

"Q. By that you mean the collision? A. Yes; the collision.

"Q. When you say the captain told you to steady her, when was that, with reference to the collision? A. I can't give you any definite time at all.

"Q. I am not asking for the time, but I am asking whether it was before or after the collision? A. That was after the collision, sir.

"Q. From your experience on board of the Sonoma, what would you say with reference to her being slow or quick to answer her helm? A. Well, gentlemen, the ship was slow to answer her wheel, but, when she starts to go, she goes quick.

"Q. That is, she is slow to start? A. She is slow to start, but, when she does go, she goes quick.

"Q. Now, upon these occasions, when you threw your helm to starboard, and to port and to starboard again, you say that she (had) not begun to answer her helm? A. No, sir.

"Q. How could you tell that? Where were you? A. My compass was right before me, sir.

"Q. That would show the moment that she started? A. The moment she started, sir.

"Q. How were these orders given, hard-a-starboard, and then hard-a-port and then hard-a-starboard again, whether quick, one right after the other, or some time between them? A. Well, it was quick, but still there was some delay, too, at the same time, from hard-a-port to hard-a-starboard and steady her. I want to explain to you, gentlemen, before you write it down.

"Q. Make your explanation, anything you have got to say go on and tell it. Whatever you have got, let us have it. A. When putting the helm from hard-a-port to hard-a-starboard, it takes some time for the helm to get over to hard-a-starboard from hard-a-port, or from even amidships. That would cause, perhaps, a moment of delay.

"Q. Is that all? A. That is all.

"Q. But, outside of that, they were given one right after the other? A. One right after the other; yes.

"Q. And then the crash came, as I understand you? A. Yes, sir.

"Q. And then after that you got the order to steady? A. To steady, yes; that is by Capt. Cousins.

"Q. That is, he was on the bridge by that time and gave you the order to steady? A. Yes, sir."

The foregoing was on direct examination.

On cross-examination the witness was questioned and answered, among other things, as follows:

"Q. I asked you this: Did the vessel swing or did not the vessel swing at any time after these orders were executed, according to the compass? A. According to the compass, she might have swung and she might not. A ship's head may swing, and the compass might not move.

"Q. According to the compass, I am asking you. A. According to the compass, I do not think she swung any, because by the time that the helm was hard over she was hard over the other way. It steadied her by going on the other side. By the time she was going over quarter way, she steadied, too. The ship must have been on her course.

"Q. Then it is your opinion— A. My opinion is that the ship was steering north 45 west.

"Q. Your opinion is that even though the compass did not show any swing of the vessel, still the vessel might have swung on her course?

"Mr. Frank: He did not say that.

"Mr. Whipple: Q. I am asking for your opinion. A. No. sir; that ain't my opinion at all.

"Q. In other words, you believe that the vessel kept a straight line? A. I believe that the ship never swung any.

"Q. You believe she did not? A. No; because she was slow in answering. She did not have time to swing.

"Q. Is your testimony which you gave before the inspectors that on the second order to starboard she was kept that way some time, is that correct? A. That is correct.

"Q. Then you do believe she did swing on that order? A. She must have swung on that order, because I did not get the order to steady her from Capt. Cousins until after the collision.

"Q. When he told you to steady her, how was the helm? A. Hard over to starboard.

"Q. How long had it been that way? A. Well, now, I wouldn't swear to that. I don't know how long it was, sir.

"Q. You would not swear to it. What do you think? A. I would not say nothing about it. I won't say nothing about it. I don't know how long it was over.

"Q. Would you say what your best recollection is as to the intervals between those orders? A. Well, I don't want to get caught in anything if I possibly can help it.

"Mr. Frank: Q. What do you mean by getting caught? A. I don't want to try and say 2 or 3 minutes or 20 minutes. I don't know how long it was, because you know when you come to a collision—I don't suppose you gentlemen have ever been in one—when you come to a collision, a minute seems a long time, a long time.

"Mr. Whipple: Q. You don't know anything about this collision? A. I know when we hit her.

"Q. You didn't know it till then? A. I knew it then. I thought we were up alongside of a warehouse, bumping up against one.

"Q. Then you won't state how long the intervals were between these various orders? A. No; I will not, sir.

"Q. You will not deny then that the last order to put the helm to starboard was two minutes before the collision? A. Two minutes? Well, I didn't have no clock. I didn't have no time there.

"Q. So far as you know, it might have been two minutes before the collision? A. It might have been two minutes."

Redirect examination:

"Mr. Frank: Q. Now, Casson, when you answered this last question, that was put into your mouth by the attorney that the last order—

"Mr. Gregory: We object to that statement by counsel, and we furthermore reiterate our objection to any leading questions asked by Mr. Frank.

"Mr. Frank: Q. (continuing) To starboard the helm might have been two minutes before the collision; what did you mean by that? Do you mean to say you don't know how long it was or do you mean to say that that time elapsed? A. I don't know.

"Q. Now, as a matter of fact, were you taking any note of time at all at that time? A. No, sir.

"Q. And how would you judge time, if you judged it at all? With reference to what? A. Well, now, I can't swear to that, because, as I told you, when a thing comes like that, and when you come to a crash, certainly a minute seems a long, long time.

"Q. Well, now, let me ask you another question. Am I correct when I say that on your direct examination you testified that you got your order to hard-a-starboard, and as soon as you executed that you got it to hard-a-port, that you immediately started to hard-a-port and got halfway to port when you got another order to hard-a-starboard, and you got half way to starboard when the crash came? Is that right?

"Mr. Gregory: We object to that as leading. A. I swear to that.

"Mr. Gregory: And, furthermore, upon the ground that the witness himself stated upon direct examination exactly what took place, according to his recollection, and this is putting words in his mouth which he has not testified.

"Mr. Frank: He has already so testified.

"Mr. Gregory: That is my objection to it.

"Mr. Frank: That is your objection, but it is not well founded, because that is exactly what he testified to, and I am trying to get the witness to state the thing exactly as it lies in his memory.

"Mr. Gregory: As you want it.

"Mr. Frank: Not as you want it, then.

"Mr. Gregory: That is right. I agree to that.

"Mr. Frank: Q. When counsel asked you whether or not it was a long time after you got the second order to starboard the helm before the collision, what did you understand by that? A. Starboard the helm, sir? I would like you to explain. I ain't got a very good education, and I don't understand what you are talking about unless you explain it to me.

"Q. Very well. Now, then, state for yourself how the orders were given and when the collision occurred. A. Well, it was just like a flash, sir. Of course, there was a delay in time between hard-a-port and hard-a-starboard and steady her, but I guess the time I got the word or orders was just like a flash. From that time till the time that we struck I think it ought to have taken three minutes, I guess.

"Q. When you say you guess it ought to have taken three minutes, what do you base that on?. Were you paying any attention to time? A. No, sir; I was not paying any attention to the time.

"Q. Then how do you come to fix it at three minutes; is that a guess? A. Yes; just guesswork, sir."

Taking this testimony of the appellant's own witness as construed by its own proctor, it appears that, although the steamer sighted the green light of the schooner about 12 minutes before the collision and when they were about four miles apart, the first order given looking to keeping the steamer out of the way was given almost immediately before the collision, when the three orders that were given came in such rapid succession that they were characterized by the witness as coming in "a flash."

We also extract from the testimony of Keneally, the third officer of the Sonoma, who was in charge of the deck at the time in question:

"Mr. Frank: Q. Mr. Keneally, you were the mate on board of the Sonoma —the third officer on board of the Sonoma at the time of the collision? A. Yes, sir.

"Q. In charge of the deck? A. Yes, sir.

"Q. How long before the collision was it that you first saw any lights? A. About seven minutes.

"Q. How was your attention attracted to the light? A. I picked it up myself first, about a half a point on the port bow.

"Q. On the port bow? A. Yes, sir.

"Q. Did anybody report it to you? A. No—the night watchman afterwards.

"Q. He reported it to you afterwards? A. Yes, sir.

"Q. What did you do when you saw the light? A. I got a pair of glasses, and was on top of the house looking at it. I was expecting it to come down wing and wing. I was afraid of it coming down that way.

"Q. How long did you watch her? A. Well, I could not say. I think about two minutes.

"Q. What did you do? A. After watching it, I thought she was across my bow, and I hollered down to my wheelman 'Hard-a-starboard.' I told the quartermaster to put it hard-a-starboard.

"Q. It was a green light that you saw? A. Yes, sir.

"Q. How did that bring her green light? A. About anywhere from a point to a point and a half on the starboard bow.

"Q. How long did you continue on that course? A. Now, I could not say, sir. It was not very long.

"Q. What happened next? A. Well, all of a sudden I saw the green light went out altogether.

"Q. What happened? A. Then a red light flared up.

"Q. What happened then? A. After seeing her, I told the quartermaster to put the wheel hard-a-port.

"Q. How long was it from the time the red light flared up until the time of the collision? A. Well, a minute at the outside. She was right close aboard of us then, sir.

"Q. Right close aboard? A. Right close aboard.

"Q. What order did you then give? Did I understand you to say that you told the quartermaster to put the wheel hard-a-port? A. When I seen his red light first, I told the quartermaster to put the wheel hard-a-port, figuring it would clear him that way, but then I could not clear him that way, I would have cut him right in two, and I told the quartermaster to put the wheel hard-a-port.

"Q. You say 'Hard-a-port.' You mean 'hard-a-starboard'? A. Hard-a-starboard the last time.

"Q. How rapid, if at all, did those orders follow each other? A. Well, the first order, there might have been a minute's interval between hard-a-starboard and hard-a-port.

"Mr. Whipple: Q. Hard-a-starboard and hard-a-port, what do you mean by that?

"Mr. Frank: Just a minute. You have a right to cross-examine the witness.

"Q. Between hard-a-port and the second hard-a-starboard? A. No, sir; the first.

"Q. Well, I mean between the second? A. Well, the wheel was not hard-a-port before I shifted it to hard-a-starboard.

"Q. You shifted the wheel hard-a-starboard? A. Yes, sir.

"Q. How long was that before the collision? A. That was almost at the collision.

"Q. Then when these orders were given, as I understand you, you were in such a position that you did not know how you could avoid her and you were trying to avoid her in some way? A. Yes, sir.

"Q. And were doing the best you could? A. Yes, sir.

"Q. What did you do with the engines? A. I backed the port engine full speed and slowed the starboard engine.

"Q. How long was that before the collision? A. That was when we were almost at the collision point. The ships had almost come together.

"Q. Did you notice whether she swung in or swung out? A. No, sir; I did not."

It is apparent, we think, from this testimony of the appellant's own witnesses, as well as from other evidence in the record, that the steamer, although aware of the approach of the schooner in ample time to have gotten out of her way, did absolutely nothing to do so until a collision was imminent, when one order after another order was given in such rapid succession as to be ineffective.

In respect to the lights upon the schooner, there was positive testimony to the effect that both her green and red lights were bright and in place, and, although there was evidence on the part of the appellant tending to the contrary, the finding of the trial court was against the appellant.

The judgment is affirmed.